SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court. In the interest of brevity, portions of an opinion may not have been summarized.

## In the Matter of Carlia M. Brady (D-10-19) (083462)

**Argued April 30, 2020 -- Decided August 6, 2020**

**PER CURIAM**

By Presentment filed with the Court in this judicial disciplinary matter, the Advisory Committee on Judicial Conduct (ACJC) found by clear and convincing evidence that respondent Carlia M. Brady, formerly a Judge of the Superior Court, violated four provisions of the Code of Judicial Conduct (Code). The ACJC unanimously recommended the sanction of removal from judicial office.

Respondent was sworn in as a Judge on April 5, 2013. On June 11, 2013, officers of the Woodbridge Township Police Department (WTPD) arrested respondent at her home for "knowingly harboring Jason Prontnicki, a known fugitive," in her residence. The Court suspended respondent from her judicial duties without pay and referred the matter to the ACJC. The three criminal charges against respondent were eventually dropped, and the Court reinstated respondent to her judicial duties in March 2018.

In May 2018, the ACJC issued a Complaint charging respondent with conduct that violated Canon 1, Rule 1.1; Canon 2, Rules 2.1 and 2.3(A); and Canon 5, Rule 5.1(A) of the Code. At the ACJC hearing, the following facts emerged.

On June 10, 2013, respondent had been a Superior Court judge for approximately two months. She and Prontnicki had been involved in a romantic relationship for about six months, and Prontnicki was living in respondent's home.

On that morning, respondent appeared at WTPD headquarters to report her car missing. She met with two police sergeants and Officer Robert Bartko. Respondent told the officers that Prontnicki, her boyfriend, had taken one of her cars without permission. The officers explained the procedure to file a criminal complaint against Prontnicki, but respondent declined to do so. While respondent was at the station, officers learned there were two open warrants for Prontnicki's arrest, one for a violent crime, and that his driver's license had been suspended. The officers told respondent about Prontnicki's open warrants and suspended license. The police report reflects that the officers told respondent that as "an officer of the court," she was required to report to them "if and when" Prontnicki returned with the car, so they could arrest him.

1

Shortly after respondent returned home, Prontnicki called her. Respondent testified that Prontnicki told her he would return her car, that he denied knowing of any warrants or a suspended license, and that she told him that he needed to "go to the police and take care of it right away." It is undisputed that -- after speaking with Prontnicki -- respondent did not call the police to advise them Prontnicki would be at her home.

Respondent testified that, when Prontnicki arrived, he walked past her father into the house. Respondent said she was "a little surprised and shocked and then fearful," and that she told Prontnicki to leave. Nonetheless, she and Prontnicki talked in her garage for about an hour, joined by her father for the final fifteen minutes of their conversation.

Approximately fifteen minutes after Prontnicki left her home, respondent called the WTPD, asked to speak with Bartko, and left a message on Bartko's voicemail. Respondent notified police that her car had been returned, but other contents of that message are disputed. Respondent contended before the ACJC and the Court that the WTPD tampered with the voicemail to delete part of her message.

The next morning, on June 11, 2013, Prontnicki called respondent, and they spoke for more than two and a half hours. Respondent testified that during that call, Prontnicki confirmed he would be staying with his brother and said he needed to retrieve belongings from her home. They made an appointment for that afternoon, and Prontnicki called later to confirm their appointment. Respondent did not notify the police after either call.

Respondent left a second message for Officer Bartko later that afternoon, confirming that her car had been returned. Respondent contends that the WTPD also tampered with and intentionally deleted parts of her second voicemail. Bartko did not retrieve either of respondent's messages until after respondent was arrested.

Meanwhile, WTPD officers conducted surveillance of respondent's residence during the afternoon of June 11, 2013. When Prontnicki left her house, a WTPD officer arrested Prontnicki. Shortly after his arrest, members of the WTPD went to respondent's home and arrested her for hindering Prontnicki's apprehension. One testified that when respondent was arrested, she said, "I've been vetted, take the cuffs off." According to the police report, respondent directed officers to take the handcuffs off of her, then asked to be handcuffed with her hands in front of her rather than behind her. The officers refused.

Later that evening, officers and an assistant prosecutor presented a Superior Court judge a complaint warrant alleging that respondent had "harbor[ed]" Prontnicki in her residence "for approximately 1 hour and never ma[de] any attempt to contact law enforcement." Although one officer was aware that respondent had left voicemails for Bartko, he did not disclose those voicemails to the judge. The judge signed the complaint warrant. Before the ACJC, an officer conceded that the statement in the complaint warrant that respondent never tried to contact law enforcement was inaccurate.

2

At the ACJC hearing, both respondent and the Presenter offered expert testimony by psychologists and audio engineering experts. The ACJC found by clear and convincing evidence that respondent violated the Code. With respect to contested facts and the two issues that the parties' experts disputed, the ACJC made findings in the Presenter's favor. The ACJC recommended respondent's removal from judicial office.

Respondent moved before the Court to dismiss the Presentment, or, in the alternative, to modify the ACJC's recommendation that she be removed from office. After oral argument on that motion, the Court entered an Order to Show Cause denying the motion to dismiss and requiring respondent to show cause "why she should not be publicly disciplined through the imposition of an appropriate sanction that is less than removal, the Court having determined on its review of the matter that the appropriate quantum of discipline shall not include removal."

**HELD:** The Court concurs in substantial part with the ACJC's factual findings and holds that clear and convincing evidence supports the ACJC's determination that respondent committed the Code violations charged. The Court modifies the ACJC's recommendation that respondent be removed from judicial office, however, and instead imposes on respondent a three-month suspension from judicial duties.

1. New Jersey's system of judicial discipline exists to preserve public confidence in the integrity and the independence of the judiciary. To that end, every judge is duty bound to abide by and enforce the standards in the Code of Judicial Conduct. A judge's acts need not be criminal in order to implicate the Code. Four provisions of the Code govern this disciplinary matter, and the Court reviews each. (pp. 19-21)

2. After an independent review of the record presented to the ACJC, the Court finds that the Presenter met her burden to prove by clear and convincing evidence a core allegation. Despite ample opportunity to contact the WTPD in advance of Prontnicki's visits to her home on June 10 and 11, 2013, respondent declined to do so. When she did call the police after Prontnicki's departure on each of those two days, she was not forthcoming about her contacts with him and did not reveal her detailed knowledge of his activities. Whether the transcript of the voicemail is accurate or whether it is missing information because of police misconduct, respondent was not fully forthcoming with the WTPD. The Court does not accept respondent's contention that she acted as she did because the officers allegedly instructed on June 10, 2013 that she should contact police only in specific circumstances, nor does the Court find credible that she refrained from calling the police because she feared that Prontnicki would injure her. The evidence supports the inference that respondent acted in the hope that she could assist Prontnicki and preserve their relationship while maintaining her judicial career. The Court views respondent's comment that she was "vetted" to be a reference to her judicial status intended to discourage the officers from handcuffing her. (pp. 21-32)

3

3.  Relying only on clear and convincing evidence, the Court views respondent's communications with the WTPD on June 10 and 11, 2013 to fall short of the high standards imposed by the Code.  Respondent was undoubtedly in a difficult situation during the two days at issue here, and it is understandable that she was upset as those disturbing events unfolded.  As a judge, however, respondent was not at liberty to address her circumstances with only herself and her personal relationships in mind.  The public has the right to expect that when police officers are searching for a fugitive accused of a violent crime and a judge has detailed knowledge of the whereabouts, activities and immediate plans of that fugitive, the judge will take prompt and decisive action to ensure that law enforcement is fully informed.  There is no exception to that principle when the judge and the fugitive have a personal relationship.  Respondent did not meet the high standard imposed on the judiciary, and she did not discharge her responsibility to the public.  Although the Court considers respondent's comment that she had been "vetted" and her direction to the officers about handcuffing improper, that portion of the evidence is far less important to the Court's determination than the evidence regarding respondent's communications with the WTPD and her representations about the WTPD's alleged directive not to call police except under specific conditions, which the Court does not find credible.  In sum, based on a de novo review of the record, the Court finds clear and convincing evidence that respondent violated Canon 1, Rule 1.1; Canon 2, Rules 2.1 and 2.3(A); and Canon 5, Rule 5.1(A) of the Code.  (pp. 32-35)

4.  In considering the appropriate sanction for respondent's violation of the Code, the Court weighs the aggravating and mitigating factors collected in In re Subryan, 187 N.J. 139, 153-54 (2006).  The aggravating factor of public policy -- in this instance the public policy of ensuring the safety of a community by promptly arresting suspects in violent crimes -- weighs in favor of a significant sanction.  Because respondent handled her communications with the WTPD in a manner "unbecoming and inappropriate for one holding the position of a judge," id. at 153, the Court considers that aggravating factor as well.  The Court also considers mitigating factors.  This was the first ethics complaint against respondent, who had been on the bench for only two months when these incidents occurred.  The Court acknowledges the emotional stress that respondent experienced on June 10 and 11, 2013, and in the nearly five years of criminal proceedings that followed, and the profound impact the events at issue have had on her life and career.  The Court sees no evidence, however, that respondent has a "sincere commitment to overcoming the fault" in this case.  Id. at 154.  Balancing the applicable aggravating and mitigating factors, the Court modifies the sanction of removal recommended by the ACJC and imposes a three-month suspension on respondent.  (pp. 36-39)

**Respondent is suspended from judicial duties for a period of three months.**

**JUSTICE FERNANDEZ-VINA, concurring,** would remove Judge Brady from the bench.  But, because the Court's Order to Show Cause took away removal from the bench as a potential sanction, Justice Fernandez-Vina concurs with the majority's decision.

4

**JUSTICE ALBIN, dissenting,** is of the view that, based on the record, Judge Brady did not harbor a fugitive or obstruct a police investigation. Nor did her conduct demean the judiciary. Justice Albin stresses that Judge Brady's conduct should not be viewed from the sterile, twenty/twenty perspective of hindsight, but rather from that of a vulnerable human being, fatigued and frightened, in the grip of overwhelming stress, who, in the moment, made decisions that, even if flawed, do not rise to a level that warrants discipline. In Justice Albin's view, Judge Brady is the victim of a misguided and failed criminal prosecution that has left her career as a judge in ruins and of a disciplinary review that has overlooked police malfeasance, her good-faith efforts, and the human element. Because he does not believe that the charges against Judge Brady have been sustained by clear and convincing evidence, Justice Albin finds that the imposition of discipline is not justified.

**JUSTICE LaVECCHIA, dissenting,** is not persuaded there is clear and convincing evidence in this record to sustain disciplinary charges.

**CHIEF JUSTICE RABNER and JUSTICES PATTERSON and SOLOMON join in the Court's opinion. JUSTICE FERNANDEZ-VINA filed a concurrence. JUSTICES ALBIN and LaVECCHIA each filed a dissent. JUSTICE TIMPONE did not participate.**

In the Matter of

Carlia M. Brady,

a Judge of the Superior Court

of the State of New Jersey

On an Order to Show Cause Why Respondent
Should Not Be Publicly Disciplined through the
Imposition of an Appropriate Sanction that does not
include Removal from Judicial Office.

| Argued | Decided |
|--------|---------|
| April 30, 2020 | August 6, 2020 |

Maureen G. Bauman, Designated Presenter, argued the
cause on behalf of the Advisory Committee on
Judicial Conduct.

Respondent argued the cause on her own behalf.

PER CURIAM

By Presentment filed with the Court in this judicial disciplinary matter,

the Advisory Committee on Judicial Conduct (ACJC) found by clear and

convincing evidence that respondent Carlia M. Brady, formerly a Judge of the

Superior Court, violated Canon 1, Rule 1.1; Canon 2, Rules 2.1 and 2.3(A);

1

and Canon 5, Rule 5.1(A) of the Code of Judicial Conduct (Code). The ACJC unanimously recommended the sanction of removal from judicial office.

We concur in substantial part with the ACJC's factual findings and hold that clear and convincing evidence supports the ACJC's determination that respondent committed the Code violations charged. We modify the ACJC's recommendation that respondent be removed from judicial office, however, and instead impose on respondent a three-month suspension from judicial duties.

I.

A.

Respondent, who was admitted to the Bar in 1997, was sworn in as a Judge of the Superior Court on April 5, 2013.

On June 11, 2013, officers of the Woodbridge Township Police Department (WTPD) arrested respondent at her home in Woodbridge. She was charged in a complaint warrant with hindering the apprehension of another, in violation of N.J.S.A. 2C:29-3, by "knowingly harboring Jason Prontnicki, a known fugitive," in her residence.

The following day, this Court suspended respondent from her judicial duties without pay and referred the matter to the ACJC. In accordance with its policy regarding disciplinary proceedings against judges charged with criminal

2

offenses, the ACJC took no action on the referral of the disciplinary matter pending completion of the criminal proceedings.

After respondent's criminal matter was transferred from Middlesex County to Somerset County, a grand jury indicted respondent on three charges: second-degree official misconduct in violation of N.J.S.A. 2C:30-2(b), third-degree hindering apprehension or prosecution in violation of N.J.S.A. 2C:29-3(a)(1), and third-degree hindering apprehension or prosecution in violation of N.J.S.A. 2C:29-3(a)(2). The trial court granted respondent's motion to dismiss the official misconduct charge but denied her motion to dismiss the hindering apprehension or prosecution charges. The State appealed the dismissal of the official misconduct charge, and respondent appealed the denial of her motion to dismiss the other charges. The Appellate Division affirmed the trial court's determinations and remanded the matter to the trial court for further proceedings. State v. Brady, 452 N.J. Super. 143, 174 (App. Div. 2017).

The State moved to dismiss with prejudice the remaining two counts of the indictment. On March 2, 2018, the trial court granted that motion, thus concluding the criminal proceedings against respondent.

On March 6, 2018, this Court reinstated respondent to her duties as a Superior Court judge.

B.

1.

On May 4, 2018, the ACJC issued a Complaint charging respondent with conduct that violated Canon 1, Rule 1.1; Canon 2, Rules 2.1 and 2.3(A); and Canon 5, Rule 5.1(A) of the Code.  In her Answer, respondent denied violating any provision of the Code.

Pursuant to Rule 2:15-3(b), four members of the ACJC conducted a seven-day hearing on the matter.  Other participating members of the ACJC reviewed the record and briefs.  At the hearing, the Presenter called five fact witnesses and two expert witnesses.  Respondent, represented by counsel, testified and called two fact witnesses and two expert witnesses.

2.

We summarize the factual evidence presented to the ACJC based on the record of the hearing.

On June 10, 2013, respondent had been a Superior Court judge for approximately two months.  She and Prontnicki had been involved in a romantic relationship for about six months, and Prontnicki was living in respondent's home.  According to respondent's testimony before the ACJC, she was undergoing medical treatment in order to have a child with Prontnicki, and was told by her physician that she might be pregnant.

4

On the morning of June 10, 2013, respondent appeared at WTPD headquarters, and stated that she wanted to report her car missing. At the police station, she met with Sergeant James Mullarney, Sergeant Walter Bukowski, and Officer Robert Bartko.[1]

Respondent told the officers that Prontnicki, her boyfriend, had taken one of her cars without permission. According to respondent, after giving a false account of her vehicle's location, Prontnicki had admitted loaning it to a friend who lived in Bayonne. Respondent indicated that she and Prontnicki had spent two hours the previous night driving around Bayonne and Jersey City looking for the missing car. She stated that when she left Prontnicki in Jersey City to return to her home, she told him that if she did not hear from him by 10:00 a.m. about the status of her car, she would report the vehicle as stolen. Respondent informed the officers that she had not heard from Prontnicki since she had dropped him off in Jersey City.

The officers explained to respondent the procedure to file a criminal complaint against Prontnicki, but respondent declined to do so. She indicated that she preferred to file a complaint against Prontnicki's friend in Bayonne,

---

[1] Officer Bartko testified that when he returned to WTPD headquarters from patrol to process respondent's complaint, he was told by another officer that respondent was a Superior Court judge. The record does not reveal how the officers learned that information.

whom she believed had her car, but officers could not find any record of a person with the name that respondent provided them.

While respondent was still at the police station, officers learned that there were two open warrants for Prontnicki's arrest. One of those warrants arose from the armed robbery of a pharmacy in Old Bridge on April 29, 2013, in which the perpetrator allegedly threatened a pharmacist with a crowbar, demanding drugs. The officers also learned that Prontnicki's driver's license had been suspended. The officer told respondent about Prontnicki's open warrants and suspended license. The police report reflects that the officers told respondent that as "an officer of the court," she was required to report to them "if and when" Prontnicki returned with the car, so that they could arrest him.

Respondent reported to two friends that morning by text that she had just learned that Prontnicki had threatened a pharmacist with a crowbar on April 29, 2013. Respondent sent a text message to one of those friends stating that when the incident at the pharmacy had occurred, Prontnicki "was already staying with me and I was a judge." She added, "I can't have him in my house cos I wud now be harboring a criminal . . . I wud have to report him."

At 1:11 p.m., shortly after respondent returned to her home, Prontnicki called her. Respondent testified that Prontnicki told her that he had her car

6

and would return it, and that she told Prontnicki that police officers had advised her that he had outstanding warrants and a suspended license. According to respondent, Prontnicki denied knowing of any warrants or a suspended license, and she told him that he needed to "go to the police and take care of it right away." Respondent testified that Prontnicki said he would bring back her car first, and she told him "fine, it would be nice if you brought back [the] car, but you can't come in my house."

Immediately following that call, respondent texted her friend that Prontnicki "just called to tell me he got the car and will bring it home." She added that she had told Prontnicki "he can't stay with me cos he has a warrant out for his arrest and I am required to notify authorities when I know someone has a warrant[.] So I told him he must leave after he drops the car off as I must go to the police[.]"

It is undisputed that -- after speaking with Prontnicki -- respondent did not call the police to advise them that Prontnicki would be at her home. She explained that the officers had "told me not to call until if and when he gets back to the house or I know his exact location." She stated that based on her "interaction" with the police, "it seemed to me the police were not interested in going out unless they can just take him and not have to do any kind of surveillance or anything."

Respondent then called her parents and asked them to meet her at her house, and they did so.

At approximately 3:00 p.m., Prontnicki arrived at respondent's home. According to respondent, Prontnicki rang the doorbell, and when her father answered the door, Prontnicki walked past her father into the house. Respondent said she was "a little surprised and shocked and then fearful," and that she told Prontnicki to leave. Nonetheless, after Prontnicki walked through the house to the garage, she followed him. Respondent testified that Prontnicki said he was unwilling to leave her home immediately because it was raining. She and Prontnicki then talked in her garage for about an hour, joined by her father for the final fifteen minutes of their conversation. By respondent's account, Prontnicki denied having outstanding warrants and suggested to respondent that the police might be "trying to get you because you're a judge."

Eventually, Prontnicki used respondent's cellphone to call his brother, and his brother drove to respondent's home and picked him up. Shortly thereafter, respondent called Prontnicki and they spoke briefly.

At 4:36 p.m. on June 10, 2013, approximately fifteen minutes after Prontnicki left her home, respondent called the WTPD, asked to speak with Bartko, and left a message on Bartko's voicemail. The contents of that

8

message are disputed. According to the audio recordings that the WTPD produced, respondent's June 10, 2013 voicemail message stated:

> Hi, um, Officer Bartko, this is Carlia Brady. I submitted, I sat with you to fill out incident report number 13065290/1 um with regard to the unlawful taking of my car. Um, I just wanted to report to you that, um, Jason Prontnicki, the suspect, um, actually returned it just now. Um, it is in my driveway. I haven't inspected it yet cause it's raining and I didn't bring it into my house because I don't want it in my house unless I can inspect it. Um, I just wanted to let that be known. Also, to let you know since there's a warrant out for his arrest, he is not with me, but he is in Woodbridge cause he left, um, my property so please give me a call back. I, we need to know whether an amended report needs to be redone, um, or added, whatever I needed to do. Please give me a call back [telephone number]. Carlia Brady, [telephone number].

Respondent contended before the ACJC, and contends before this Court, that the WTPD tampered with the voicemail to delete part of her June 10, 2013 voicemail message. At the ACJC hearing, respondent was asked to describe what she had said on the portion of the voicemail that she claims was deleted. She testified that she thought she said that Prontnicki was not with her but with his brother who shares his last name and "lives in Woodbridge about a mile away. I don't have his exact address or I don't know his exact address, but it's by the ShopRite and ice cream parlor area. Please give me a call back and I'll give you as much detail as possible." Respondent's mother testified that she

9

heard respondent provide that information while leaving her voicemail for Bartko.

At 10:07 the next morning, June 11, 2013, Prontnicki called respondent, and they spoke for more than two and a half hours. Respondent testified that during that call, Prontnicki confirmed he would be staying with his brother in Woodbridge and said he needed to retrieve belongings from her home. Respondent testified that Prontnicki said his brother -- not Prontnicki himself -- would pick up the belongings. According to Prontnicki -- as recorded in a statement to police -- he contacted respondent early in the afternoon of June 11, 2013 to confirm that she would be home between 3:00 p.m. and 4:00 p.m. that day so he could pick up his belongings. Based on telephone records, that call occurred at 1:49 p.m. on June 11, 2013. Respondent did not notify the police after either call.

According to respondent's texts to her friend that afternoon, Prontnicki attempted to reassure her that he had done nothing unlawful and that their relationship could be salvaged. Her texts state that Prontnicki identified two other men as the actual perpetrators of the robbery, that he denied that there were any warrants for his arrest or that his license was suspended, that he said he would turn himself in and cooperate with police, that he reassured her that

10

he would "fix everything," and that if he and respondent had a child, he would arrange for a relative to pay support for that child.

Respondent texted her friend stating that Prontnicki "can't stay in my house cos he has an arrest warrant right now and I have a duty as a judge to report all crimes and anyone with an arrest warrant. So he is at his brother's house." A short time later, she told the friend that when Prontnicki assured her that there was no warrant for his arrest, she responded that "without written verified proof he and I can't be seen or stay at my house together."

At 3:31 p.m. on June 11, 2013, respondent left a second voicemail message for Bartko. According to the audio recordings that the WTPD produced, the second voicemail stated:

> Hi, good afternoon, Officer Bartko, this is Carlia Brady, um, I filled out a police report with you two days ago regarding my, um, car that was, uh, I, you know, I was trying to say it was stolen. Um, I don't know if you got my message yesterday, but the car has been returned by Jason Prontnicki. I have it, um, I just wanna amend the police report and I need to know whether I should come in and amend that and when, um, you're available so I can get an amended report, or if you can call me and let me know when I can pick up an amended report to reflect the car has been returned. Obviously um, I have my property back, so, um, please give me a call . . . [two telephone numbers]. It's Carlia Brady. Thank you.

Respondent contends that the WTPD also tampered with her June 11, 2013 voicemail, and that officers intentionally deleted a portion of that

11

voicemail. She identifies the deleted content as "something to the effect of you didn't call me back, I left you message yesterday with -- I want to update the whereabouts of Jason Prontnicki, the fugitive, and I don't know who else to call. You were the person I know of, you're on the police report, something to that effect."

Bartko, who rarely received voicemails on his extension at WTPD headquarters and checked his voicemail only at the beginning of his four days on duty in accordance with WTPD procedure, did not retrieve either of respondent's messages until after respondent was arrested.

Undetected by respondent, WTPD officers conducted surveillance of her residence during the afternoon of June 11, 2013. According to the WTPD, at 3:48 p.m., driven by his brother, Prontnicki arrived at respondent's home. He entered the garage and spoke with respondent. While his brother waited in his car, Prontnicki remained in respondent's home for about an hour. Prontnicki then left with a duffel bag and was driven away by his brother. Shortly thereafter, a WTPD officer stopped the vehicle and arrested Prontnicki. As those events transpired, respondent remained at home, texting a friend; she repeated that she and Prontnicki "can't be seen together or stay at my house together."

Shortly after Prontnicki's arrest, Sergeant Brian Murphy, Detective Chris Lyons, and Officer Sean Grogan of the WTPD went to respondent's home and arrested her for hindering Prontnicki's apprehension. According to respondent and one of the officers, respondent told the officers that she had called the police department twice. One officer testified that when respondent was arrested, she said, "I've been vetted, take the cuffs off." According to the police report, respondent directed officers to take the handcuffs off of her, then asked to be handcuffed with her hands in front of her rather than behind her. The officers refused both requests.

Respondent was escorted to Bartko's patrol car, and he drove her to the police station. In comments recorded in the patrol car, respondent told Bartko that she might be pregnant and that Prontnicki was the father. She said that, in light of Prontnicki's denial that there was a warrant for his arrest, she did not "know who to believe." Respondent said, "All I did was help this person. He was my boyfriend. There was never any incident before this." Before the ACJC, respondent stated that her comment about "help" for Prontnicki referred to his living at her home, not to any "help" given to him after she learned of the warrants for his arrest.

After escorting respondent to the processing room at WTPD headquarters, Bartko retrieved the voicemails and listened to them with other

officers. Murphy directed that the voicemails be recorded as potential evidence, and they were recorded on a digital recorder. Before the ACJC, the testifying officers denied respondent's allegation that they tampered with the voicemail evidence.

Later that evening, Murphy, Grogan, and an assistant prosecutor went to the home of a Superior Court judge. The officers presented to the judge a complaint warrant alleging that respondent had "harbor[ed]" Prontnicki in her residence "for approximately 1 hour and never ma[de] any attempt to contact law enforcement." Although Murphy was aware that respondent had left voicemails for Bartko the previous day and that afternoon, he did not disclose those voicemails to the judge. The judge signed the complaint warrant. Before the ACJC, Murphy conceded that the statement in the complaint warrant that respondent never tried to contact law enforcement was inaccurate.

### 3.

The parties presented expert reports to the ACJC with respect to respondent's two core defenses to the charges: that her actions following the disclosure of Prontnicki's arrest warrants were attributable to a temporary mental health condition that had since been successfully treated, and that the WTPD tampered with the recordings of her June 10, 2013 and June 11, 2013 voicemails by deleting portions of those voicemails.

14

With respect to the first defense, respondent presented the testimony of Peter P. Oropeza, Psy.D. Dr. Oropeza testified that "stressors" -- including respondent's memory of domestic abuse in a prior relationship, sleep deprivation, a lack of food, and the disclosures about Prontnicki's behavior -- significantly impacted respondent's decision-making on June 10 and 11, 2013. Dr. Oropeza opined that, due to those stressors, respondent was "at times thinking irrationally," that she showed early symptoms of trauma and other conditions, and that she feared that Prontnicki would harm her. Dr. Oropeza opined, however, that in the years since the events at issue, respondent underwent mental health treatment. He testified that at the time of the ACJC hearing she appeared "able to perform her duties" as a Superior Court judge.

In rebuttal, the Presenter offered the testimony of Carla Rodgers, M.D., a psychiatrist. Dr. Rodgers opined that it was impossible for a mental health professional to render a retrospective diagnosis of respondent's mental condition on June 10 and 11, 2013, and that respondent's conduct on those dates could not be attributed -- to a reasonable degree of medical probability -- to "stressors."

To support her contention that the WTPD deleted portions of the voicemails that she left for Bartko, respondent offered the report of Arlo West,

a forensic audio expert.[2] West opined "to a high degree of audio engineering certainty" that the copies of the voicemails obtained from the WTPD's internal voicemail system and from the WTPD's "NICE" Inform System 4.1, a computer system, were not authentic copies. Citing "gaps" in those copies, West opined that they contained "a re-recording of an edited version" and appeared to be "masking attempt[s]." He also opined that the copies of the voicemails obtained from the "NICE" computer system were "an inauthentic rendering of the [v]oicemails" and "an edited version."

In rebuttal, the Presenter submitted to the ACJC the report of a forensic audio expert, Bruce Koenig. Koenig opined that the recordings were authentic clones of the original voicemail recordings and that they "revealed no discontinuities, deletions, additions, or other types of events indicative of editing processes." He stated that what West viewed as "gaps" in a portion of the voicemails recorded on the NICE recording system were a function of that system's "Activity Detector" system, which allows the recording of only "active audio" and the compression of periods of silence between "active" segments.

---

[2] The parties agreed to rely only on the reports of their forensic audio experts, and not to call those experts as witnesses during the hearing before the ACJC.

16

The ACJC found by clear and convincing evidence that respondent violated Canon 1, Rule 1.1; Canon 2, Rules 2.1 and 2.3(A); and Canon 5, Rule 5.1(A) of the Code. With respect to contested facts and the two issues that the parties' experts disputed, the ACJC made findings in the Presenter's favor.

In its Presentment, the ACJC addressed the key question of respondent's communications with the police on June 10 and 11, 2013. It found clear and convincing evidence that in respondent's communications with the WTPD, she had "attempted to evade her ethical obligations . . . by offering the police intentionally vague and irrelevant information about [Prontnicki's] known whereabouts to appear cooperative while willfully withholding relevant information," thereby placing "a greater emphasis on her personal concerns than her ethical constraints as a jurist."

Finding the testimony of respondent and her mother as to the contents of her voicemails and the opinion of her forensic audio expert not to be credible, the ACJC rejected respondent's contention that the WTPD altered the voicemails. It also discounted the contention of respondent and her expert, Dr. Oropeza, that she acted out of fear that Prontnicki would harm her.

Finally, the ACJC found that respondent's comment during her arrest that she had been "vetted" was a "direct reference to her judicial office" and

17

that when she requested that the officers dispense with their practice of handcuffing an arrestee, she sought preferential treatment because of her office. The ACJC based its ultimate recommendation, however, on the timing and substance of respondent's communications with the WTPD about Prontnicki prior to her arrest, not her comments during her arrest.

Based on its finding that respondent violated the Code, the ACJC recommended respondent's removal from judicial office.

## C.

Pursuant to Rule 2:15-16, respondent moved before this Court to dismiss the Presentment, or, in the alternative, to modify the ACJC's recommendation that she be removed from office. After oral argument on that motion, the Court entered an Order to Show Cause denying the motion to dismiss and requiring respondent to show cause, in accordance with Rule 2:15-17(b)(2), "why she should not be publicly disciplined through the imposition of an appropriate sanction that is less than removal, the Court having determined on its review of the matter that the appropriate quantum of discipline shall not include removal." Respondent appeared on the return date of the Order to Show Cause and presented argument to the Court.

## II.

### A.

New Jersey's system of judicial discipline exists "to preserve 'public confidence in the integrity and the independence of the judiciary.'" In re Russo, ___ N.J. ___, ___ (2020) (slip op. at 21) (quoting In re Seaman, 133 N.J. 67, 96 (1993)). To that end, "[e]very judge is duty bound to abide by and enforce the standards in the Code of Judicial Conduct." In re DiLeo, 216 N.J. 449, 467 (2014). The Code does not enumerate every specific act that can constitute judicial misconduct; it is instead "a general statement of standards and goals, admirably serving the purpose of providing guidance to judges in all matters precisely because of the generality of its provisions." Id. at 467-68 (quoting In re Alvino, 100 N.J. 92, 102 (1985)).

As this Court has observed, "because judges are in the public eye, 'everything [they] do can reflect on their judicial office' and has the potential to erode public confidence." In re Reddin, 221 N.J. 221, 228 (2015) (alteration in original) (quoting In re Blackman, 124 N.J. 547, 551 (1991)). "No power is greater, nor its responsibilities more awesome, than that given a judge." In re Samay, 166 N.J. 25, 43 (2001) (quoting In re Coruzzi, 95 N.J. 557, 563 (1984)). "That awesome power is bestowed upon a judge on the condition that

19

the judge not abuse or misuse it to further a personal objective such as a vendetta or to help a friend." Id. at 43.

A judge's acts need not be criminal in order to implicate the Code; "[c]onduct that in itself does not constitute a criminal offense may be violative of standards governing performance, warranting discipline or removal for cause." In re Yaccarino, 101 N.J. 342, 353 (1985).

Four provisions of the Code govern this disciplinary matter.[3]

Canon 1, Rule 1.1 provides that "[a] judge shall participate in establishing, maintaining and enforcing, and shall personally observe, high standards of conduct so that the integrity, impartiality and independence of the judiciary is preserved."

Canon 2, Rule 2.1 requires that a judge "act at all times in a manner that promotes public confidence in the independence, integrity and impartiality of the judiciary, and . . . avoid impropriety and the appearance of impropriety." Rule 2.1 applies to a judge's personal conduct in addition to his or her judicial activities. As the Comment to that Rule explains,

> [a] judge must avoid all impropriety and appearance of impropriety and must expect to be the subject of

---

[3] The Revised Code of Judicial Conduct became effective on September 1, 2016, after the events at issue here. With no objection from respondent, the ACJC found that there were no substantive distinctions between the prior Code and the Revised Code that were relevant to this matter, and decided this matter under the Revised Code. We also apply the Revised Code.

20

constant public scrutiny. This principle applies to both the professional and personal conduct of a judge. A judge must therefore accept restrictions on personal conduct that might be viewed as burdensome by the ordinary citizen and should do so freely and willingly.

\* \* \*

With regard to the personal conduct of a judge, an appearance of impropriety is created when an individual who observes the judge's personal conduct has a reasonable basis to doubt the judge's integrity and impartiality.

Canon 2, Rule 2.3(A) prohibits judges from "lend[ing] the prestige of judicial office to advance the personal or economic interests of the judge or others," or allowing others to do so.

Finally, Canon 5, Rule 5.1(A) requires judges to "conduct their extrajudicial activities in a manner that would not cast reasonable doubt on the judge's capacity to act impartially as a judge, demean the judicial office, or interfere with the proper performance of judicial duties."

## B.

### 1.

Guided by the applicable provisions of the Code, we review de novo the record presented to the ACJC. In re Williams, 169 N.J. 264, 271 (2001); Seaman, 133 N.J. at 74. In that review, we independently determine "whether

21

the record demonstrates conduct that departed from the strictures delineated in the Canons of Judicial Conduct." In re Perskie, 207 N.J. 275, 289 (2011).

We apply the clear-and-convincing standard of proof. R. 2:15-15(a); In re Boggia, 203 N.J. 1, 12 (2010). "Clear-and-convincing evidence is that which produce[s] . . . a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable [the factfinder] to come to a clear conviction, without hesitancy, of the precise facts at issue." Williams, 169 N.J. at 271 (alterations in original) (quoting Seaman, 133 N.J. at 74). That standard is exacting; "the seriousness of [an allegation of judicial misconduct], and the possible consequences to the judge, require that we have a clear and accurate understanding of facts that may give rise to discipline." Id. at 272.

## 2.

We do not share the dissent's view that every factual assertion made by respondent during her testimony before the ACJC is to be credited, or its rejection of all testimony that contradicts an assertion made by respondent. See, e.g. post at ___ (slip op. at 9-12, 14-20, 28-31). Instead, after an independent review of the record presented to the ACJC in accordance with the clear-and-convincing burden of proof, we concur with some of the ACJC's factual findings, and decline to adopt others.

22

We find that the Presenter met her burden to prove by clear and convincing evidence a core allegation. Despite ample opportunity to contact the WTPD in advance of Prontnicki's visits to her home on June 10 and 11, 2013, respondent declined to do so. When she did call the police after Prontnicki's departure on each of those two days, she was not forthcoming about her contacts with him and did not reveal her detailed knowledge of his activities.

When respondent left WTPD headquarters on June 10, 2013, she knew that Prontnicki stood accused of a violent robbery and was considered a fugitive. As she revealed to a friend, respondent was concerned that Prontnicki committed the alleged offense while he was living at her home and that the incident occurred after she became a judge.

Nonetheless, respondent did not prioritize law enforcement's urgent need to locate and arrest Prontnicki over personal considerations. Instead, she strategized about how to avoid circumstances that, in her view, would trigger a duty to advise the police of his whereabouts. Respondent concluded that if Prontnicki continued to stay at her home, she would have to "report him," and thus decided that he must move to another residence. Her reasoning provides important context for what occurred that afternoon and the following day.

It is undisputed that at 1:11 p.m. on June 10, 2013, Prontnicki called respondent. Respondent concedes that she learned on that call that Prontnicki

23

would come to her home later that day to return her car. The record reveals part of their conversation. As respondent advised a friend, she told Prontnicki in that telephone call that his continued residence in her home would require her to contact the police, as she considered herself "required to notify authorities" when she knew "someone has a warrant." She said that she had told Prontnicki that he "must leave after he drops the car off as I must go to the police."

It is undisputed that respondent did not notify the WTPD about the telephone call and Prontnicki's planned visit later that afternoon, thus forfeiting an opportunity for the police to arrest him immediately. She made no attempt to contact the WTPD prior to Prontnicki's anticipated arrival.

Prontnicki did not leave respondent's home immediately after returning her missing car, as respondent had said she would insist. He stayed at respondent's home with her and her parents for more than an hour, spending most of that time in a private conversation with respondent in her garage and, at one point, using her cellphone to call his brother. Respondent called the WTPD about fifteen minutes after Prontnicki's departure, and left the first of her two voicemails for Bartko.

Respondent and her mother testified that respondent informed the WTPD on that voicemail that Prontnicki was staying with his brother, and that she

provided the brother's name and the approximate location of his home. Respondent claims that the WTPD tampered with the recording to remove that portion of her voicemail. The WTPD denied that allegation, and the parties' forensic audio experts sharply disputed the technical evidence on the alleged tampering in the reports submitted to the ACJC.

We do not premise our conclusion on a determination as to which forensic audio expert's report presented to the ACJC is the more persuasive. Whether the transcript of the voicemail is accurate or whether it is missing information because of police misconduct, respondent was not fully forthcoming with the WTPD. Her undisputed comment on the voicemail that Prontnicki "is in Woodbridge cause he left, um, my property" suggests that she had only a vague notion of his general location based on her car's reappearance at her Woodbridge home. Even in her version of the voicemail, respondent did not disclose that Prontnicki had been at her home for more than an hour, that she had an extended conversation with him during that visit, or that she had spoken with him twice that day by telephone. Viewed in conjunction with respondent's contemporaneous texts to her friends, either version of the voicemail confirms that respondent's priority was not public safety, but her personal concerns.

25

The record of what occurred the following day, largely undisputed, underscores respondent's approach to the situation that confronted her. That morning, she and Prontnicki spoke by telephone for two and a half hours. Respondent told her friends that on that protracted telephone call, she and Prontnicki discussed respondent's potential pregnancy, he "[t]old me he is sorry 30000 times," he said he knew who had committed the armed robbery, and he attempted to salvage their relationship.

As confirmed by respondent's texts and comments to Bartko after her arrest, Prontnicki's assurances left her uncertain as to whether he had committed a crime or had outstanding warrants; as she later told Bartko, she did not "know who to believe." Addressing her friend, she defined her duty as a judge to require that she "report all crimes and anyone with an arrest warrant," and suggested again that the solution to her quandary was to make sure that Prontnicki did not live at her home. She did not, however, consider herself obligated to report Prontnicki's call to her, and she did not contact the WTPD in the wake of that call.

There is no clear and convincing proof that during respondent's telephone call with Prontnicki on the morning of June 11, 2013 he made concrete plans to visit respondent's home and retrieve his belongings. Prontnicki, however, told police that he called respondent at 1:49 p.m. and

26

advised her that he would arrive at her home between 3:00 and 4:00 p.m. If Prontnicki's statement is correct, respondent had reason to anticipate that Prontnicki would shortly reappear, yet she made no effort to alert the WTPD. The officers learned about Prontnicki's visit to respondent's home that afternoon only because they conducted surveillance.

Just before Prontnicki arrived, respondent left her second message for Bartko, this one focused on her expressed intent to "amend the police report" on the theft of her car to reflect the fact that Prontnicki had returned it. Even if we assume for purposes of our analysis that the voicemail actually contained the additional information that respondent contends was deleted from it, it would be only slightly more informative than the version reflected in the transcript. Respondent does not contend that she told Bartko of Prontnicki's impending visit or their hours of conversation that day; instead, she claims only that she said she wanted to update Bartko about Prontnicki's whereabouts and had the name of no other WTPD officer but Bartko. Even in respondent's version of her voicemail, she did not reveal to the police Prontnicki's calls or visits to her home. Had the police not initiated surveillance, they would have lost a second opportunity to arrest Prontnicki.

Respondent asserts that two factors prompted her decision not to alert the WTPD of Prontnicki's contacts with her: the officers' alleged instructions

on June 10, 2013 that she contact police only in specific circumstances, and her fear that Prontnicki would harm her. We consider each in turn.

The police report states that at WTPD headquarters, officers reminded respondent "of her status as an officer of the Court, that it was incumbent upon her to report to the Police if and when [Prontnicki] came back with the car that he was there, in order for us to arrest him." According to Mullarney, he and Bukowski told respondent that "when you get in touch with him again and he comes back with this car," she "ha[d] to call us," because it was "incumbent" on her as "an officer of the court" to "tell somebody this guy's wanted for a robbery and he's got my car."

Respondent testified before the ACJC that one of the officers told her to call them "if and when [Prontnicki] gets home and we'll go out there." According to respondent, she asked the officers whether they wanted her to call "when this person's right in front of me in my presence indicating I don't want to get killed," and "they said no, just call when you know his exact location," which she interpreted to mean she did not "need to have him in my house" when she made the call.

Respondent, however, told her psychologist, Dr. Oropeza, that "the police had said for her to call if and when [Prontnicki] was at the house, at her

house," and that meant to her that she should call when Prontnicki "literally" was at her home.

In oral argument before this Court, respondent initially said that officers directed her not to contact WTPD before Prontnicki arrived at her house, but also stated that they instructed her that she should call police only if Prontnicki arrived at her home or she knew his exact location at the time of the call. Respondent speculated that the officers instructed her not to call them other than in those circumstances because they wanted to avoid the necessity of conducting surveillance before arresting Prontnicki.

Respondent's contention that the officers discouraged her from informing them about the current activities of a fugitive suspect in an armed robbery unless one of two conditions were met is contrary to the police report and the officers' testimony. Moreover, if the WTPD instructed respondent as she claims they did, she disregarded those instructions. Not only did respondent fail to alert the WTPD prior to either of Prontnicki's visits to her home that he would be there shortly, but she also did not report her extensive in-person and telephone conversations with Prontnicki to police after the fact. We do not accept respondent's contention that she acted as she did because of a directive from the WTPD.

Nor do we find credible the assertion of respondent, supported by the opinion of her expert psychologist, that she refrained from calling the police because she feared that Prontnicki would injure her. We view the clear and convincing evidence to belie that assertion.

Alerted that Prontnicki would be at her house to return her car on the afternoon of June 10, 2013, respondent did not call the police or leave the premises; instead, she summoned her parents to her home. After Prontnicki arrived, respondent spoke with him for over an hour, all but the last portion of that time alone with him in her garage. Respondent spent hours on the telephone with Prontnicki over the two-day period at issue in this matter. As respondent reported those conversations to her friends, a remorseful Prontnicki profusely apologized for having put respondent in a difficult situation, vowed to resolve his legal problems and repair their relationship, and discussed the prospect that he and respondent would have a child.

Most significantly, although respondent had advance warning of Prontnicki's arrival at her home on the afternoon of June 11, 2013 to collect his belongings, she took no precaution to protect herself from potential harm. She did not seek the protection of the police. She did not leave Prontnicki's belongings outside the house and depart the premises. Instead, she waited alone in her home for his arrival.

The evidence simply does not support respondent's assertion that her actions on June 10 and 11, 2013 were prompted by fear, and we do not find that claim credible.[4]

In short, clear and convincing evidence supports the Presenter's contention that respondent disclosed very little of what she knew about Prontnicki's location, activities, and plans to the police. The evidence supports the inference that respondent acted not at the direction of the police or because she feared harm, but in the hope that she could assist Prontnicki and preserve their relationship while maintaining her judicial career.

Finally, we briefly address respondent's comments during her arrest on June 11, 2013. There is clear and convincing evidence that respondent asserted at the time of her arrest that she had been "vetted," and requested that she not be handcuffed after her arrest or that she be handcuffed with her hands in front of her, not behind her.

It is clear that respondent's comment that she had been "vetted" was not an attempt to reveal her judicial status to the WTPD officers; the evidence

---

[4] We are mindful of respondent's testimony before the ACJC that she was the victim of domestic violence in a prior relationship. Although we make no factual findings about the allegation, in light of the testimony, we do not assert that respondent was obligated to contact police while Prontnicki was in her home. There was ample time before Prontnicki arrived on both June 10 and June 11, 2013 for respondent to alert police of his impending visits.

shows that as of the previous day, the officers already knew that respondent was a Superior Court judge, and alluded to her judicial status in the police report. There is, however, a factual dispute as to the import of that comment. The Presenter contended and the ACJC concluded that respondent stated she had been "vetted" to remind the officers of her judicial status and secure favorable treatment. Respondent insists that her reference to being "vetted" was nothing more than an effort to reassure the officers that she represented no threat to their safety.

Considering respondent's statement that she had been "vetted" in conjunction with her demands not to be handcuffed or to be handcuffed in a certain manner, we view that comment to be a reference to respondent's judicial status, intended to discourage the officers from handcuffing her in accordance with their normal procedures.

3.

Relying only on clear and convincing evidence, we view respondent's communications with the WTPD on June 10 and 11, 2013 to fall short of the high standards imposed by the Code. Respondent clearly understood that the charges against Prontnicki were serious and that the police viewed public safety to be at risk while he remained at large. Yet she disclosed only minimal information about her extensive contacts with Prontnicki. Based on her

32

conversations with Prontnicki, her texts to her friends, and her communications with the WTPD, it is apparent that respondent's priorities were her personal concerns -- particularly her relationship with Prontnicki -- not her duty to the public.

Respondent was undoubtedly in a difficult situation during the two days at issue here. Alarmed by the disappearance of her car and exhausted from searching for it, and believing that she might be pregnant with a child fathered by Prontnicki, she was shocked by the officers' revelation of his outstanding warrants and suspended driver's license. It is understandable that respondent was upset as those disturbing events unfolded.

As a judge, however, respondent was not at liberty to address her circumstances with only herself and her personal relationships in mind. The WTPD was searching for an individual who allegedly robbed a pharmacy by threatening a pharmacist with a crowbar. A judge had found probable cause and issued a warrant for his arrest, and WTPD officers were charged to execute that warrant in the interest of public safety. It was incumbent on respondent to fully cooperate with law enforcement in their search for Prontnicki, notwithstanding her distressing personal circumstances.

As the evidence makes clear, respondent did not do so. Respondent declined to call the police station prior to Prontnicki's visits to her home,

33

where officers could have arrested him. In her two voicemails to the WTPD, she detailed her intention to amend the complaint she had made the previous day, stressing that Prontnicki had returned her car and suggesting that the situation was resolved. At best, her communications to law enforcement were perfunctory and vague. Those communications stand in stark contrast to the candid and detailed accounts she provided by text to her friends, in real time.

Moreover, while leaving a voicemail for a specific officer is an important first step, it is not the only method of alerting a police department about an important development in the investigation of a violent crime. Respondent could have contacted the officers by using WTPD headquarters' general telephone number, calling 9-1-1, or visiting the headquarters as she had done only hours before.

The public has the right to expect that when police officers are searching for a fugitive accused of a violent crime and a judge has detailed knowledge of the whereabouts, activities and immediate plans of that fugitive, the judge will take prompt and decisive action to ensure that law enforcement is fully informed. There is no exception to that principle when the judge and the fugitive have a personal relationship.

Respondent did not meet the high standard imposed on the judiciary, and she did not discharge her responsibility to the public. An individual who

34

observed respondent's personal conduct on the relevant days would have "a reasonable basis to doubt the judge's integrity and impartiality." Code of Judicial Conduct, cmt. 3 on Canon 2, Rule 2.1.

As noted, we do not find credible respondent's repeated claim that WTPD officers prohibited her from contacting them unless Prontnicki was at her house or she knew at the moment of her call exactly where he was. That informs our consideration of this matter. See Russo, ___ N.J. at ___ (slip op. at 25) ("Respondent's explanations under oath about what occurred also reveal a lack of candor on multiple occasions, which factors into our judgment in this matter.").

Although we consider respondent's comment that she had been "vetted" and her direction to the officers about handcuffing improper, that portion of the evidence is far less important to our determination than the evidence regarding respondent's communications with the WTPD and her representations before the ACJC and this Court about the WTPD's alleged directive to her not to call police except under specific conditions.

In sum, based on our de novo review of the record, we find clear and convincing evidence that respondent violated Canon 1, Rule 1.1; Canon 2, Rules 2.1 and 2.3(A); and Canon 5, Rule 5.1(A) of the Code.

35

III.

We consider the appropriate sanction for respondent's violation of the Code.[5] That inquiry "requires more than establishing some instance or instances of unethical conduct" and warrants "a more searching and expansive inquiry . . . carefully scrutiniz[ing] the substantive offenses that constitute the core of respondent's misconduct, the underlying facts, and the surrounding circumstances in determining the nature and extent of discipline." Seaman, 133 N.J. at 98 (alterations in original) (quoting In re Collester, 126 N.J. 468, 472 (1992)).

The Court has identified aggravating and mitigating factors that may be relevant to a given case:

> "Among the surrounding circumstances to which we give heed are . . . considerations of public policy," including the State's commitment to ending gender discrimination and, particularly, sexual harassment. Other relevant considerations include "whether the

---

[5] Respondent's judicial service ended on April 4, 2020, when her seven-year term as a Superior Court judge expired without reappointment. See N.J. Const. art. VI, § 6, ¶ 3 (providing that Supreme Court justices and Superior Court judges "shall hold their offices for initial terms of 7 years and upon reappointment shall hold their offices during good behavior"). We retain the authority to discipline her for her conduct during her service. See, e.g., In re Breslin, 162 N.J. 190, 191 (2000) (imposing sanction of removal on former Municipal Court judge); In re D'Ambrosio, 157 N.J. 186, 187 (1999) (publicly reprimanding Superior Court judge who had resigned from judicial office); In re Imbriani, 139 N.J. 262, 263-67 (1995) (imposing sanction of removal on retired Superior Court judge).

36

misconduct involves a misuse of judicial authority[,] . . . is unbecoming and inappropriate for one holding the position of a judge, . . . [or] has been harmful to others." On the other side of the scale we weigh whether "a matter represents the first complaint against a judge, . . . the length and . . . quality of the judge's tenure in office, [the judge's] personal and professional reputation, [his or her] sincere commitment to overcoming the fault, [and his or her] remorse and attempts at apology or reparations to the victim." "We have also found relevant consideration of whether a judge found guilty of misconduct will engage in similar misconduct in the future, or whether the inappropriate behavior is susceptible to modification."

[In re Subryan, 187 N.J. 139, 153-54 (2006) (alterations in original) (quoting Seaman, 133 N.J. at 98-100).]

In this matter, the aggravating factor of public policy -- in this instance the public policy of ensuring the safety of a community by promptly arresting suspects in violent crimes -- weighs in favor of a significant sanction. Because respondent handled her communications with the WTPD in a manner "unbecoming and inappropriate for one holding the position of a judge," id. at 153, we consider that aggravating factor as well.[6]

---

[6] Like the ACJC, whose recommendation of removal "does not turn on the events related to [r]espondent's reactions to being handcuffed upon her arrest," we do not consider those events in assessing the aggravating factors relevant to this matter.

37

We also consider mitigating factors. This was the first ethics complaint against respondent, who had been on the bench for only two months when these incidents occurred. We acknowledge the emotional stress that respondent experienced on June 10 and 11, 2013, and in the nearly five years of criminal proceedings that followed, and the profound impact the events at issue have had on her life and career. See Williams, 169 N.J. at 279 (noting that the respondent in that matter had "already paid a heavy price for her intemperate behavior.").

We see no evidence, however, that respondent has a "sincere commitment to overcoming the fault" in this case. See Subryan, 187 N.J. at 154. Indeed, during oral argument before this Court, respondent identified only one action that she should have taken and did not take: she said that she should have sought the advice of the Assignment Judge of the vicinage in which she served. Respondent otherwise expressed no regrets about her actions during the critical two days. Accordingly, we do not consider remorse and a determination to avoid any similar concerns in the future -- factors that have weighed against serious sanctions in other cases -- to constitute mitigating factors in this matter.

Balancing the applicable aggravating and mitigating factors, we modify the sanction of removal recommended by the ACJC and impose a three-month

38

suspension on respondent. We view that sanction to be commensurate with the conduct proven by clear and convincing evidence and to further our disciplinary system's purpose of preserving public confidence in the judiciary.

## IV.

Based on our independent review of the record, we conclude that there is clear and convincing evidence that respondent violated Canon 1, Rule 1.1; Canon 2, Rules 2.1 and 2.3(A); and Canon 5, Rule 5.1(A) of the Code. We find that the appropriate discipline is a three-month suspension.

So Ordered.

CHIEF JUSTICE RABNER and JUSTICES PATTERSON and SOLOMON join in the Court's opinion. JUSTICE FERNANDEZ-VINA filed a concurrence. JUSTICES ALBIN and LaVECCHIA each filed a dissent. JUSTICE TIMPONE did not participate.

In the Matter of

Carlia M. Brady,

a Judge of the Superior Court

of the State of New Jersey

JUSTICE FERNANDEZ-VINA, concurring.

I concur with the majority's thorough de novo factual findings and analysis of Carlia M. Brady's conduct.

I previously dissented from the Court's March 10, 2020 Order to Show Cause, which took away removal from the bench as a potential sanction.

I would dissent from the majority's determination that Carlia M. Brady's conduct warrants only a three-month suspension. I agree with the ACJC's well-reasoned Presentment recommending removal from the bench.

I also find that the majority's analysis today equally supports removal from the bench beyond a reasonable doubt. Since removal from the bench is not available as a sanction, I concur with the majority's decision. See Mathews v. United States, 485 U.S. 58, 67 (1988) (Brennan, J., concurring) ("Were I judging on a clean slate, I would still be inclined to adopt the view that the entrapment defense should focus exclusively on the government's conduct. But I am not

1

writing on a clean slate; the Court has spoken definitively on this point.  Therefore

I bow to stare decisis, and today join the judgment and reasoning of the Court.").

In the Matter of

Carlia M. Brady,

a Judge of the Superior Court

of the State of New Jersey

JUSTICE ALBIN, dissenting.

Today's majority decision is a sad epilogue to Judge Carlia Brady's seven-year nightmare journey through the criminal justice system and the judicial disciplinary process. Seven years ago, Judge Brady was the quintessential American success story -- a Filipino-American immigrant, who became an accomplished lawyer and rose from the ranks of the Bar to become a Superior Court judge. Just several months after her judicial appointment, her career, her reputation, her health -- her life -- would be in ruins, the victim of overzealous Woodbridge Township police officers, who filed criminal charges that could not be sustained in court.

Those dismissed criminal charges and the current judicial disciplinary charges stem from a tumultuous, thirty-six-hour period in Judge Brady's life. During that period, while reporting to the police the theft of her car, she learned that her live-in boyfriend, the father of her unborn child -- the man with whom she had planned a future -- was a potentially dangerous criminal

1

and wanted for the robbery of a drugstore.  In a state of shock -- with her reality shattered and her trust betrayed -- fatigued by twenty-four sleepless hours, and stressed about her pregnancy, Judge Brady should have been the object of at least a modicum of police solicitude.  Instead, she became the target of a hapless police investigation designed to make the case that she was harboring a criminal.

Without getting guidance from the prosecutor's office, and in a reckless rush to judgment, Woodbridge Township police officers arrested Judge Brady on the unsustainable charge of harboring a fugitive -- and did so without returning her earlier telephone calls or listening to two voicemails she left with a police officer, one notifying him of her boyfriend's presence in Woodbridge. Officers then withheld their knowledge of the potentially exculpatory voicemails from a Superior Court judge, perhaps misleading him into issuing a criminal complaint.

The filing of that complaint triggered a misguided criminal prosecution on evidence so thin and lacking in substance that the Appellate Division affirmed the dismissal of one charge, and the trial court, on motion by the State, dismissed the two remaining charges.  During the nearly five-year prosecution, Judge Brady was suspended from her judicial duties.  Judge

2

Brady then exited from the criminal justice system and entered into the judicial disciplinary process.

The Advisory Committee on Judicial Conduct (ACJC) held hearings and issued a one-sided Presentment against Judge Brady. In doing so, the ACJC affirmed the doubtful credibility of the Woodbridge Township police officers, drew every adverse inference against Judge Brady, accepted between dueling expert reports the ones that disadvantaged Judge Brady, and then recommended to this Court that Judge Brady be removed from office -- a recommendation rejected by every Justice but one sitting on this case.

From my review of the record, Judge Brady did not harbor a fugitive or obstruct a police investigation. Nor did her conduct demean the judiciary. Judge Brady's conduct should not be viewed from the sterile, twenty/twenty perspective of hindsight, but rather from that of a vulnerable human being, fatigued and frightened, in the grip of overwhelming stress, who, in the moment, made decisions that, even if flawed, do not rise to a level that warrants discipline. Had the police returned Judge Brady's phone calls, there is no reason to doubt she would have responded truthfully to any questions presented to her about the location of her boyfriend. I do not find justified the post-mortem criticism of Judge Brady -- that she should be disciplined for not leaving more information on a voicemail that the police recklessly failed to

3

retrieve and for not acting as the perfect police informant during the tumultuous hours at issue (ACJC and the majority), and for not calling the police in the presence of a potentially violent criminal (ACJC).

Although judges must be held to high standards of conduct in their private lives, they too are subject to the harsh vicissitudes of life. Judges can be deceived in their personal relationships; judges can suffer psychological stress and trauma; and even judges are not immune from the abuses of the criminal justice system. In the end, I view Judge Brady as a victim, more deserving of an apology than a suspension. During the pendency of the criminal and judicial disciplinary proceedings, the period for her reappointment came and went, ending Judge Brady's judicial career.

Because I do not believe that the charges against Judge Brady have been sustained by clear and convincing evidence, the imposition of discipline is not justified. I therefore respectfully dissent.[1]

---

[1] The facts adduced here are derived from the testimony of various witnesses and exhibits presented at the proceedings before the ACJC. Among the witnesses who testified were Judge Brady and her parents, Woodbridge Township police officers, and expert witnesses.

I.

A.

In April 2013, after ten years at the law firm of Stark and Stark, Judge Brady, then forty-one years old, celebrated the most significant accomplishment in her career -- her appointment to the Superior Court in the Middlesex County vicinage.[2] Judge Brady began her legal career in that very same vicinage as a judicial law clerk more than a decade and a half earlier. She testified that her clerkship coincided with a dark period in her personal life during which she was the victim of domestic violence. Her then husband, she alleges, physically and psychologically abused her.[3] Those scarring experiences, in part, shaped her response to the events of June 2013.

Judge Brady began dating Jason Prontnicki at the end of 2012. The relationship progressed with much promise. Prontnicki told Judge Brady that he was a chemical engineer. He appeared clean cut, well dressed, and wholesome, and she fell in love with him. By March 2013, Prontnicki had moved into Judge Brady's home in Woodbridge. The two planned a future

---

[2] After her appointment, Judge Brady was assigned to the Civil Part.

[3] Before the ACJC, Judge Brady described her marriage as "physically, mentally, financially, [and] emotionally abusive." She recalled an incident during which she demanded that her husband leave the residence. As she attempted to call the police, her husband assaulted her, pulling her hair out and punching her in the mouth. The beating left her bloodied and bruised.

together and decided to have a child. Although at some point Prontnicki became jobless, Judge Brady never saw Prontnicki use drugs and was unaware that he had a criminal background.

In an effort to conceive a child, Judge Brady underwent fertility treatments that involved the injection of hormones that, she explained, often impacted her emotional state.

B.

On Sunday, June 9, 2013, Judge Brady started her day with customary routines. She went to the gym in the morning and later to church, and in the afternoon to the Menlo Park Mall to shop.

Judge Brady owned two vehicles, a Mercedes and a Honda. Prontnicki told her that morning that he was taking the Honda to visit his father in a hospital in Bayonne. She returned home in the Mercedes around 4:30 p.m., and shortly afterwards Prontnicki entered the house. Prontnicki told Judge Brady that he had to go back to the hospital to check on his father. When he did not return home as planned, Judge Brady decided to join her parents for dinner. As she entered her garage, to her surprise, she discovered that both her Mercedes and Honda were missing. Because Prontnicki did not have a cell phone, she had no means of contacting him.

At approximately 8:00 p.m., Prontnicki arrived home in the Mercedes and explained to Judge Brady that he had left the Honda with his brother. She was disturbed and became more so when she learned that story was a lie. Later in the evening, Prontnicki claimed that he loaned the car to a down-on-his-luck person named Kareem Williams, whose daughter was hospitalized. Judge Brady not only doubted the truth of what Prontnicki told her, but also doubted whether their relationship would survive this breach of trust.

Judge Brady's first priority, however, was to retrieve her Honda. Prontnicki used Judge Brady's cell phone to purportedly call Williams, who supposedly lived somewhere in Bayonne, to arrange for the return of the car. By 1:00 a.m. on June 10, with the Honda still missing, Judge Brady decided to search for it in the Bayonne/Jersey City area where, according to Prontnicki, Williams resided. In her Mercedes, she and Prontnicki circled the streets looking in vain for the missing car. Around 3:00 a.m., they went back home to see if the Honda had been returned, but it had not. They then ventured out again to locate the Honda. In Jersey City, Prontnicki exited the car to search on foot. As he did so, Judge Brady warned him that if the car was not returned by 9:00 a.m., she would go to the police.

At 9:04 a.m., she texted the following message to the number she believed belonged to Kareem Williams: "This is Carlia Brady[.] I will give

you and Jason [Prontnicki] until 10 am to return my vehicle or tell me where it is located[.] After that I will report this to the [police]." Seven minutes later, she texted a similar message.

Shortly after 10:00 a.m., without sleep for more than twenty-four hours and exhausted, Judge Brady went to the Woodbridge Township Police Department to report her car missing. As she explained to the ACJC, "because of all the lies and . . . weird, unusual circumstances with the car," she began to have doubts about everything Prontnicki told her from the beginning of their relationship, and even feared a "reprisal" from him. At 10:28 a.m., she texted a friend, "I feel like my home and my life is being threatened by my boyfriend and this guy." (emphasis added). Based on her real-time text messages to her friend, Judge Brady evidently still believed that Williams had her car.

Judge Brady recounted the events relating to her missing car to Woodbridge Township Police Officer Robert Bartko and then to other officers, identifying Williams as the suspect. Lieutenant James Mullarney advised Judge Brady that a record check revealed no information about a Kareem Williams but did reveal that Prontnicki had two warrants for his arrest, one for a second-degree robbery of a pharmacy during which he allegedly threatened a pharmacist with a crowbar. She was also told that Prontnicki's driver's license was suspended.

8

Her contemporaneous text messages at police headquarters reveal her thinking in real time as she absorbed the stunning news about Prontnicki:

> [Please] call me, I will be signing a complaint against Jason. . . . And that Williams guy.
>
> I broke up with my guy last night.
>
> I am so exhausted.
>
> I just found out that Jason is wanted for Robbery for threatening a pharmacist with a crowbar [in] old bridge on April 29[.] That's when he was already staying with me and I was a judge.
>
> He never took drugs in front of me . . . [.]
>
> I can't have him in my house [because] I [would] now be harboring a criminal . . . . I [would] have to report him[.]

According to Lieutenant Mullarney's report, Judge Brady was reminded that "it was incumbent upon her to report to the Police if and when [Prontnicki] came back with the car that he was there, in order for us to arrest him." Judge Brady declined to file a complaint against Prontnicki at that time because she wanted first to confer with a lawyer and her family.

Woodbridge Township police officers knew that Prontnicki was likely to return to Judge Brady's house. They knew that he was -- as the majority describes him -- "accused of a violent robbery and . . . considered a fugitive." See ante at ___ (slip op. at 23). If, as the majority rightly states, law

9

enforcement had an "urgent need to locate and arrest Prontnicki," ante at ___ (slip op. at 23), why did the Woodbridge Township police officers not escort Judge Brady home -- if not to await Prontnicki's return, then at least to provide protection to a Superior Court judge?

One explanation is that the Woodbridge Township police had already jumped to a baseless and speculative assumption that Judge Brady was not a victim but somehow involved in some unspecifiable cover-up. Lieutenant Mullarney testified that he and Sergeant Bukowski "thought she was hiding something" -- "I don't know what she was covering. I don't know if it was for him or herself."

The other explanation is that Judge Brady's safety evidently was not a top police priority. As Lieutenant Mullarney explained, if Judge Brady wanted an escort home, she should have asked for one. "She's an adult. . . . I can't go home with them and hold their hand every minute of the day either." Absent from his consideration was that Judge Brady was operating in a complete state of exhaustion, that she had come to headquarters to report the theft of a car, and that instead, to her shock, she had learned that her live-in boyfriend was a "violent" robber.

At 1:11 p.m., Prontnicki called Judge Brady and let her know that he would return the Honda. Her response was contemporaneously memorialized in a text forwarded to a friend:

> He just called to tell me he got the car and will bring it home[.] I told him he can't stay with me [because] he has a warrant out for his arrest and I am required to notify authorities when I know someone has a warrant[.] <u>So I told him he must leave after he drops the car off as I must go to the police.</u>

> [(emphasis added).]

Judge Brady explained to the ACJC that, during her conversation with Prontnicki, she told him that he had "to go to the police and take care of it right away." He responded, "I'm going to bring back your car first."

Evidently afraid to be alone and seeking comfort, Judge Brady called her parents, who were out shopping, and asked them to come to her home. Her mother and father arrived there at approximately 3:00 p.m. A short time afterwards, the doorbell rang. Her father opened the door, and Prontnicki pushed him against the wall and walked to the middle of the living room.[4] Judge Brady was shocked and fearful, for herself and her parents, and afraid to call the police in Prontnicki's presence. Judge Brady told him to get out, but he refused. He went into the garage, and she followed him. Again, she told

---

[4] This account is essentially corroborated by the testimony of Judge Brady's parents.

11

him to leave. He denied the robbery allegations and stated that he would be staying at his brother Christopher's house. He left at approximately 4:30 p.m.

Minutes later, Judge Brady called the Woodbridge Township police headquarters and asked to speak with Officer Bartko but instead was connected with his voicemail. The Woodbridge Township police preserved the following recorded message:

> Hi, um, Officer Bartko, this is Carlia Brady. I submitted, I sat with you to fill out incident report number 13065290/1 um with regard to the unlawful taking of my car. Um, I just wanted to report to you that, um, Jason Prontnicki, the suspect, um, actually returned it just now. Um, it is in my driveway. I haven't inspected it yet cause it's raining and I didn't bring it into my house because I don't want it in my house unless I can inspect it. Um, I just wanted to let that be known. Also, to let you know since there's a warrant out for his arrest, he is not with me, but he is in Woodbridge cause he left, um, my property so please give me a call back. I, we need to know whether an amended report needs to be redone, um, or added, whatever I needed to do. Please give me a call back [telephone number]. Carlia Brady, [telephone number].
>
> [(emphases added).]

Judge Brady and her mother testified, however, that Judge Brady provided in that voicemail more precise information about Prontnicki's whereabouts. Judge Brady testified that she stated in the voicemail that Prontnicki resided with "his brother Christopher, . . . who lives in Woodbridge about a mile away. I don't have his exact address or I don't know his exact

12

address, but it's by the ShopRite and ice cream parlor area. Please give me a call back and I'll give you as much detail as possible." Judge Brady's audio expert opined that the voicemail preserved by the Woodbridge Township police had gaps, evidencing deletions. The Presenter's expert at the ACJC hearing concluded otherwise.

Importantly, the majority finds that Judge Brady "was not fully forthcoming" even if she left the more detailed message that she claims is missing from the voicemail. See ante at ___ (slip op. at 24-25, 27). That more detailed message, however, suggests that Judge Brady would have shown the police the location where Portnicki was staying. Judge Brady did not know that Officer Bartko did not check his voicemails until the beginning of every four-day shift. She had a right to expect a return call, particularly after her report at headquarters. The lax message-retrieval policies at the Woodbridge Township Police Department deprived Judge Brady of the opportunity to give to the police the more detailed information it presumably wanted.

The Presentment faults Judge Brady for not calling the police in the presence of the person who supposedly was a violent criminal. She testified, however, that she was a domestic violence survivor. Judge Brady knew what to expect by attempting to call the police in such circumstances. She told the ACJC she had been beaten by her ex-husband for doing just that.

13

The majority finds that Judge Brady made some fatal flaw in judgment by not calling the police before Prontnicki's arrival -- although she did not know the precise time he intended to drop off the car and certainly did not envision he would barge into her home. See ante at ___ (slip op. at 26-27). With the clarity of hindsight, it is easy to find fault with Judge Brady for not making perfect decisions in the hurly-burly of the moment while she was exhausted and in a sleep-deprived state, and perhaps fearful for her safety.

Yet, there is no reason to believe that, had Officer Bartko returned the voicemail message in a timely manner, Judge Brady would not have given him or any other officer as much information as she knew about Prontnicki's whereabouts. Had she received a timely response, all the events that followed likely would not have occurred. I do not believe that discipline can be justified because Judge Brady called the police at 4:30 p.m. instead of 3:00 p.m.

With no return call from Officer Bartko, Judge Brady left her house with her parents to stay in the safety of their home for that evening.

The next morning, June 11, 2013, Judge Brady's father took her home, and from there she drove to a doctor's appointment regarding her fertility treatments. She learned that she was "likely pregnant" and "should not overstrain [herself] mentally [or] physically" to avoid the risk of a miscarriage.

14

Around 10:00 a.m., Judge Brady received a call from a number she did not recognize. She picked it up, thinking that perhaps the police were responding to her earlier message, but Prontnicki was on the line. Judge Brady was angry, berated him about his lies, and asked him "what steps he'd taken to turn himself in [and] whether or not he had contacted or retained a lawyer." She attempted to confirm that he was staying at his brother's home so that she could convey that information to the police. The conversation also turned to her likely pregnancy. Prontnicki told her that he wanted to pick up his belongings, and she replied that he could not enter her home. He then said his brother would come and hung up. The telephone conversation lasted approximately two hours and forty minutes.

In a contemporaneous text message to a friend that afternoon, Judge Brady revealed that Prontnicki had told her that "he hired a lawyer and he found out that the guy who did the robbery was arrested."

## C.

In the meantime, at 2:00 p.m. that day, the Special Investigations Unit of the Woodbridge Township Police Department began a surveillance of Judge Brady's house without her knowledge. At that point, Sergeant Brian Murphy

was in charge of the investigation and the surveillance.[5]  He made no effort to call Judge Brady -- despite having two of her telephone numbers -- to see whether she had heard from Prontnicki or knew of his whereabouts.  He assumed that if Judge Brady had contacted headquarters, he would have been given that information.  He also claimed that he told the shift commander to notify him if any calls came in about Prontnicki.  No one, however, checked Officer Bartko's voicemail.

Detectives Herbert and Sean Grogan had their eyes on the house from their position, while Murphy sat in his vehicle further away to watch if any cars were entering the street.  Murphy had already designated Judge Brady a target of his investigation.  He surmised -- apparently based on a hunch -- that Judge Brady might be assisting Prontnicki in a criminal enterprise.  He sat in his vehicle, thumbing through his copy of the criminal code and "reading and re-reading the charges that possibly could come of this if there was assistance given to Prontnicki throughout this whole thing."  He had decided in his mind that if Prontnicki appeared at Judge Brady's home and "if she didn't make a phone call that she was falling within [the] hindering statute."

---

[5]  Murphy was a sergeant on June 11, 2013.  At the time of his testimony, he had been promoted to the rank of captain.

16

Although Murphy unsuccessfully attempted to call the "zone" prosecutor for advice (she was not answering her phone), he made no attempt to call any of the dozens of assistant prosecutors located in the Middlesex County Prosecutor's Office in New Brunswick for assistance. Murphy was priming himself to charge a Superior Court judge with a crime without first seeking advice or approval from the appropriate prosecutorial agency.

At approximately 2:30 p.m., Judge Brady returned home and "waited for the police to call [her] back" regarding her message of the previous day. Just fifteen minutes earlier, she texted a friend that "[Prontnicki] can't stay in my house [because] he has an arrest warrant right now and I have a duty as a judge to report all crimes and anyone with an arrest warrant."

At 3:30 p.m., while her home was under surveillance, Judge Brady called Woodbridge Township police headquarters and left a second voicemail with Officer Bartko. In the audio recording preserved by the Woodbridge Township Police Department, the second voicemail stated:

> Hi, good afternoon, Officer Bartko, this is Carlia Brady, um, I filled out a police report with you two days ago regarding my, um, car that was, uh, I, you know, I was trying to say it was stolen. Um, I don't know if you got my message yesterday, but the car has been returned by Jason Prontnicki. I have it, um, I just [want to] amend the police report and I need to know whether I should come in and amend that and when, um, you're available so I can get an amended report, or if you can call me

17

and let me know when I can pick up an amended report to reflect the car has been returned. Obviously um, I have my property back, so, um, please give me a call . . . [two telephone numbers]. It's Carlia Brady. Thank you.

Judge Brady's audio expert expressed his opinion that that voicemail also had indicia of deletions. Additionally, Judge Brady testified that the voicemail was missing part of her message, words "to the effect of you didn't call me back, I left you message yesterday with -- I want to update the whereabouts of Jason Prontnicki, the fugitive, and I don't know who else to call. You were the person I know of, you're on the police report." Because the majority does not premise its conclusion on which of the audio experts' reports was more persuasive, see ante at ___ (slip op. at 25), based on the clear-and-convincing-evidence standard, see In re Williams, 169 N.J. 264, 271 (2001), Judge Brady's claim about the contents of the message cannot be easily brushed aside.

That second attempt by Judge Brady to speak with Officer Bartko was not relayed to the surveillance team sitting outside Judge Brady's house. Murphy, educating himself on the criminal code and preparing in advance charges to file against Judge Brady, was completely -- and recklessly -- unaware of her efforts to contact the police.

18

Around 4:00 p.m., a car driven by Prontnicki's brother, carrying Prontnicki, pulled into Judge Brady's driveway. The garage door opened automatically (activated apparently by Prontnicki), and to Judge Brady's surprise, Prontnicki -- not his brother -- appeared and walked into the garage. She told him, "go get your brother, you're not supposed to be in the house. . . . You can't come in this house." Prontnicki pushed past her, saying "I just want to get my things and then I'm going to leave."

Meanwhile, the surveillance team, on the lookout for Prontnicki -- a potentially dangerous and violent armed robber -- let him slip into Judge Brady's home with apparently little concern for her safety. While Prontnicki remained inside Judge Brady's home, the surveillance team and Murphy could not know whether Judge Brady was being terrorized or physically harmed -- and yet they sat in their vehicles and waited. Murphy, who had Judge Brady's telephone number, did not call her to check on her well-being. That is evidently because the plan was not to protect her but to charge her.

Prontnicki remained in the house for approximately fifty-five minutes, packing his clothes and pleading his case to Judge Brady -- telling her there was no warrant for his arrest. After Prontnicki left, Judge Brady readied herself to go to police headquarters to report Prontnicki's whereabouts. At the

same time, the police stopped the car in which Prontnicki was a passenger and arrested him.

Approximately ten to fifteen minutes after Prontnicki's departure from the Brady residence, Murphy, accompanied by Detectives Grogan and Lyons, knocked on the front door. When Judge Brady opened the door, the officers asked her whether Prontnicki had just been in her house, and she unhesitatingly answered, "yes." Indeed, she told them, "he just left." Murphy assumed that Judge Brady had given Prontnicki the bag of clothes he was found carrying in the car and that, to his mind, was a "crime."[6]

Judge Brady was told that she was under arrest for not contacting the police. Detective Grogan recalled that Judge Brady told the assembled officers that she had called the police twice earlier and left messages. Judge Brady remembered even more precisely telling them that she had called the day before at 4:30 p.m. and again that afternoon. None of the officers stopped to say, "let's check with headquarters, let's see if Judge Brady is telling the truth." Was there a need to arrest Judge Brady before making a due diligence inquiry -- before conducting a full and fair investigation? Was she a flight risk

---

[6] At the ACJC hearing, Judge Brady denied ever packing clothes for Prontnicki.

or a danger to the community?  The same questions would be legitimate if Judge Brady were Jane Doe.

The rush to judgment was on.  Murphy had been preparing criminal charges in his police vehicle, and now he had his catch.  Judge Brady, who just hours earlier had been told that she was likely pregnant and to avoid stress, was then handcuffed from behind.  Concerned about her pregnancy, she asked not to be handcuffed in that manner -- a request that was denied.  Fearing for the safety of an unborn child, and under great stress and excitement, she stated that she had been "vetted."  It was a desperate plea to be treated humanely, if only for the sake of her pregnancy.  All the officers already knew she was a judge (and did not hesitate to arrest her) -- and if they knew anything about the appointment process, they knew she was vetted.

Officer Bartko transported Judge Brady to the police station.  During the transport, the audio system in the patrol car recorded her remarks to the officer.  In a free-flowing, unfiltered monologue, Judge Brady stated,

> <u>I did call yesterday and I called again this afternoon to find out if I can talk to the officer</u>, also if I need to come in, and once I came in I was [going to] talk to the sergeant to see if it was true that there was no actual arrest warrant . . . out for him."
>
> [(emphasis added).]

21

She went on, "I tried calling . . . yesterday. No one called me back and then he's telling me . . . he doesn't have an arrest warrant . . . . [N]o offense, I don't know who to believe." She painfully mused aloud, "I can't believe this. Why would he do this to me if, <u>why would he come to my house when I told him you can't</u>. . . . Why would he do this to me, why is he doing this. Oh my God." (emphasis added).

Those contemporaneous and spontaneous remarks do not support the conclusion that Judge Brady was attempting to obstruct a police investigation or harbor a criminal.[7]

When the officers returned to headquarters with their prisoner, they soon learned that Judge Brady had called headquarters twice -- just as she had told them. The officers, who had so hastily arrested her based on the mistaken assumption that she had not contacted the police, then listened to the messages that Officer Bartko retrieved from his voicemail. Murphy recalled that "the voicemail was played on the speaker phone and was recorded on a digital recorder and place[d] into evidence." The officers denied tampering with or altering the voicemail messages. With Judge Brady's arrest, the die was cast.

---

[7] Her remark in the patrol car that "[a]ll I did was help this person" was consistent with her repeated assertions that she encouraged Prontnicki to turn himself in to the police.

22

That evening, at approximately 8:00 p.m., Detective Grogan and Sergeant Murphy visited the home of Judge Bradley Ferencz, J.S.C., accompanied by a Middlesex County assistant prosecutor, to secure an arrest warrant for Judge Brady. The officers did not bring a copy of the voicemails. Why not? And Murphy did not "think [they] had a discussion about a voicemail" at Judge Ferencz's home. At first, Grogan made the presentation for the issuance of a warrant to Judge Ferencz, but Judge Ferencz balked. Murphy, unsatisfied with Grogan's answers to Judge Ferencz's questions, asked to be sworn in and took over. Murphy admitted that he "led the judge to believe that [Judge Brady] made no attempt to alert us to Jason Prontnicki's whereabouts" and that he succeeded in overcoming Judge Ferencz's reluctance to sign the arrest warrant.

Murphy conceded at the ACJC hearing that the information on the complaint/warrant that he presented for Judge Ferencz's signature was not accurate. The complaint/warrant alleged that Judge Brady committed the crime of hindering Prontnicki's apprehension by harboring a known armed robbery fugitive in her residence "for approximately 1 hour and <u>never making any attempt to contact law enforcement</u>." (emphasis added). Murphy, who had recently listened to the voicemails, led Judge Ferencz to believe that Judge Brady made no "attempt to contact law enforcement." That was a lie. Surely,

23

Judge Ferencz -- who indicated his hesitance about signing the warrant -- had a right to know about the voicemails, the right to hear the voicemails, and, ultimately, in his role as a neutral and detached judicial officer, the right to make an informed decision based on accurate, truthful information.[8]

With the signing of that complaint, the gears of the criminal justice system were set in motion.

D.

Judge Brady was indicted on one count of second-degree official misconduct, N.J.S.A. 2C:30-2(b); and two counts of third-degree hindering the apprehension or prosecution of Jason Prontnicki, N.J.S.A. 2C:29-3(a)(1) and (2). The Law Division dismissed the official misconduct charge, finding that Judge Brady had not acted in "her official capacity" and had no "duty inherent in her office to enforce an arrest warrant" or duty to act within "a specifically required time limit." State v. Brady, 452 N.J. Super. 143, 157 (App. Div. 2017). The Appellate Division affirmed. Id. at 174.

---

[8] At the ACJC hearing, Judge Brady's attorney referred to a memorandum forwarded by Judge Melvin Gelade, J.S.C., to Assignment Judge Travis Francis. That memorandum indicated that Judge Ferencz believed that he had been deceived at the warrant hearing. The memorandum was not offered into evidence because of its hearsay nature. But, given the information in that memorandum, the ACJC should have called Judge Ferencz to give his account of what occurred at his home. See R. 2:15-6(a).

On March 2, 2018, nearly five years after Judge Brady's arrest, the State moved to dismiss the hindering counts because of a lack of evidence to prove guilt beyond a reasonable doubt. The court granted the State's motion. Based on the dismissal of the criminal charges, on March 6, 2018, this Court reinstated Judge Brady to active duty as a Superior Court judge. That vindication was short lived.

On May 4, 2018, the ACJC filed a formal complaint against Judge Brady based on alleged violations of canons of the Code of Judicial Conduct. The complaint related to the same basic events covered by the dismissed criminal charges. The disciplinary complaint alleged that Judge Brady failed to notify the Woodbridge Township police of "Prontnicki's known whereabouts, despite her knowledge of two outstanding warrants for his arrest" and that she abused her "judicial office during her arrest."

On September 16, 2019, the ACJC returned a Presentment, finding that Judge Brady had violated various canons of judicial conduct and recommended her removal from office. While this case was pending review by this Court, Judge Brady's seven-year judicial term expired, and she was not nominated for reappointment.

25

## II.

I do not find that the disciplinary charges against Judge Brady are supported by clear and convincing evidence. See In re Seaman, 133 N.J. 67, 74 (1993); see also Williams, 169 N.J. at 271 ("[W]e independently determine whether the record satisfies that demanding burden of proof."). The ACJC's overly critical review of Judge Brady's conduct on June 11 and 12 downplayed her debilitated physical and mental condition brought on by lack of sleep, nourishment, and the shock of events, as well as the officers' abuse of their authority. The excessiveness of the ACJC's recommended discipline is acknowledged by a majority of the members of this Court.

I agree with the majority that "New Jersey's system of judicial discipline exists 'to preserve "public confidence in the integrity and the independence of the judiciary."'" See ante at ___ (slip op. at 19) (quoting In re Russo, ___ N.J. ___, ___ (2020) (slip op. at 21)). But Judge Brady did nothing to undermine the integrity and independence of the judiciary, and the public will understand that Judge Brady was the target of a run-away criminal investigation and prosecution.

I now will generally state my disagreement with the findings of the ACJC and the majority.

26

First, based on the conduct of the Woodbridge Township police discussed earlier, unlike the ACJC, I cannot credit the police testimony over Judge Brady. The most obvious evidence of deception occurred during Sergeant Murphy's appearance before Judge Ferencz. Murphy began with a half-baked assumption that Judge Brady was involved in a criminal enterprise and then set out to justify his inchoate hunch. After the police prematurely arrested Judge Brady, self-justification became the investigation's predominant goal.

The Presentment asserts that Judge Brady left "two voicemail messages for Officer Bartko that <u>carefully omitted</u> relevant information as to Mr. Prontnicki's expected presence and known whereabouts." (emphasis added). Of course, to draw that negative inference, the ACJC inferred that Judge Brady had the prescience or telepathic powers to know that Officer Bartko did not check his voicemail messages until the beginning of every four-day shift. In her first voicemail message on June 10, the one preserved by the Woodbridge Township police, Judge Brady let Officer Bartko know that Prontnicki was in Woodbridge and asked for Bartko to call her back. But Judge Brady claims that she said much more in that voicemail message to pinpoint Prontnicki's

location, and her highly credentialed and experienced audio expert, Arlo West, offered his opinion that there were significant gaps on the tapes.

In the Presentment, the ACJC found Judge Brady's "testimony and that of her mother accusing the [Woodbridge Township Police Department] of altering her voicemails incredible and the testimony of the WTPD officers denying such conduct credible." But the possibility that the voicemails were mishandled was not farfetched.

On one of the compact discs of the June 11 voicemail recording, West detected male voices, presumably officers preparing the recording. One of the voices says on that recording, "[a]nd as far as this message, whether or not she did we've got to get rid of that." The meaning of that statement, though suspicious, is difficult to discern. Had the ACJC insisted that the two audio experts testify -- and not relied solely on their reports -- there would have been a clearer basis on which to credit one expert over the other.

The Presenter forwarded the report of Bruce Koenig who, like West, was a highly credentialed and experienced audio expert. Koenig offered his opinion that the recording of the voicemails did not have indications of deletions or tampering. Koenig faulted West, in part, for relying on "The Seven Tenets of Audio Authenticity" (Seven Tenets), as "generally accepted standards used to determine audio authenticity." Yet, as recently as 2015, this

28

Court acknowledged the importance of the factors identified in the Seven Tenets -- without mentioning the Seven Tenets by name -- in determining the trustworthiness of a recording. See State v. Nantambu, 221 N.J. 390, 403 (2015).

The majority rightly does not rely on the ACJC's crediting of Koenig as the superior expert, see ante at ___ (slip op. at 25), particularly in light of the ACJC's failure to require the experts' oral testimony. That means that Judge Brady's and her mother's recollections of those phone calls, which are more detailed than the voicemails preserved by the Woodbridge Township police, should not be dismissed out of hand. Judge Brady and her mother remembered that Judge Brady gave as precise a location as she knew of the whereabouts of Prontnicki on the June 10 voicemail. Additionally, the message itself reveals that she gave a call-back number.

B.

Dr. Peter Oropeza testified before the ACJC about Judge Brady's state of mind on June 10 and 11, based on his review of prior psychological reports and his own evaluation of Judge Brady. Dr. Oropeza related the cascading stressors that overwhelmed Judge Brady and impacted her judgment -- learning that her live-in boyfriend was accused of an armed robbery and abusing drugs, fearing the potential for violence against herself and her parents, and concern

for her pregnancy compounded by lack of sleep and not eating. Judge Brady's judgment, in his view, was also influenced by the physical trauma of the domestic violence inflicted on her years earlier. Thus, on June 11, when Judge Brady believed that Prontnicki's brother would come to her home to retrieve Prontnicki's clothes and "surprisingly[,] [Prontnicki] showed up . . . she was fearful that . . . if she tried to initiate a phone call in that moment that he . . . would potentially get violent."

The ACJC was dismissive of Dr. Oropeza's professional and common-sense conclusion and credited the Presenter's expert psychologist, Dr. Carla Rogers, who, in part, opined that it was not possible to render a diagnosis on the date of the hearing regarding Judge Brady's mental state on June 9 to 11, 2013. Yet, all psychiatric and psychological opinions rendered in criminal and civil cases necessarily require the expert to go back in time to determine the subject's state of mind.

In addition, the ACJC apparently expected Judge Brady -- who testified that she was a domestic violence survivor -- to call the police in the very presence of the person who was wanted for committing a violent crime and who she had reason to fear might do harm to her.

Ultimately, the ACJC credited the evidence offered against Judge Brady as well as the negative inferences drawn from that evidence.

30

In many ways, the Presentment was a replay, a seeming revival of the doomed criminal case. I do not believe that the evidence clearly and convincingly proves that Judge Brady was involved in a grand deception. Rather, a fair reading of the record reveals that Judge Brady was the victim of a police investigation run amok -- an investigation that was built on an unfounded assumption and that cast aside inconvenient facts. To the extent that Judge Brady's conduct and text messages are susceptible to varying interpretations -- the proofs do not meet the exacting clear and convincing evidence standard required for the imposition of discipline.

C.

Contrary to the majority's accusation, I do not hold that "every factual assertion made by [Judge Brady] during her testimony before the ACJC is to be credited." See ante at ___ (slip op. at 22). I do hold, however, that the evidence must establish "a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable [the factfinder] to come to a clear conviction, without hesitancy, of the precise facts at issue." Williams, 169 N.J. at 271 (alterations in original) (quoting Seaman, 133 N.J. at 74). That is the clear-and-convincing-evidence standard to which we must subject the proofs in this case.

In light of the questionable police conduct in this case, we should not give the police testimony or reports uncritical acceptance.

The majority, moreover, selectively credits an unsworn, out-of-court hearsay statement made by Prontnicki -- a known liar with a criminal record -- to support its theory that Judge Brady violated the canons of judicial conduct. See ante at ___ (slip op. at 23, 26-27). No credence should be given to Prontnicki's unsworn, out-of-court statements to the police that contradict Judge Brady's testimony that Prontnicki showed up unexpectedly at her home on June 11 to retrieve his clothes. See ante at ___ (slip op. at 26-27). Prontnicki did not testify and was not subject to cross-examination. Any examination of Prontnicki would have revealed that he was a master of deception.

Prontnicki told Judge Brady that there was no warrant for his arrest and that he had "confirmed it with an attorney." He told her he would prove that the whole matter was a "mistake." Even though we know that those utterances were just more deceptions from Prontnicki, mistakes about arrest warrants are not a wholly uncommon occurrence. See generally, e.g., State v. Handy, 206 N.J. 39, 41-43 (2011) (noting that a dispatcher mistakenly informed officers that there was an outstanding warrant for the defendant's arrest); State v. Caldwell, 158 N.J. 452, 455 (1999) (noting that a police department's "active

32

warrant sheet" incorrectly contained a vacated warrant); State v. Green, 318 N.J. Super. 346, 349 (App. Div. 1999) (noting that police officers identified the wrong person on a warrant). Still, Judge Brady told Prontnicki to turn himself into the police, lent him no assistance, and made calls to the police concerning him that went unreturned.

Judge Brady was a judicial officer, not a deputized member of the Woodbridge Township Police Department. She did not harbor a criminal, and she did not obstruct an investigation. She did not have the reporting duties of a law enforcement official. That is a line blurred in the majority opinion.

D.

Additionally, I do not conclude that Judge Brady's spontaneous statement that she was "vetted" because she feared for the safety of her unborn child when handcuffed from behind to be the basis for judicial discipline. The arresting officers knew she was a judge. Detective Grogan, for example, stated that the word conveyed no information he did not already know about Judge Brady. She did not threaten the officers or throw around the weight of her office. She submitted to their authority. The charge related to the "vetted" statement is so lacking in merit that it should be dismissed.

## E.

Last, the job of the critic is always an easy one. The majority does not consider the maelstrom of events engulfing Judge Brady from her perspective -- and from her fragile state of mind after more than a day without sleeping or eating. Yes, from hindsight, Judge Brady could have done many things differently. Instead of calling Officer Bartko and expecting him to return her call, she could have called 9-1-1. On June 10, she could have called the police at 3:00 p.m. instead of 4:30 p.m. But had Bartko returned Judge Brady's 4:30 p.m. call and learned Prontnicki's location, this matter would have ended then. After seven years, the strained arguments now offered do not justify judicial discipline.

## III.

In the end, Judge Brady is still shadowed by the false arrest that fueled the criminal prosecution; it haunts her even in these proceedings, seven years later. Unlike my colleagues, I do not believe that Judge Brady engaged in conduct that undermines the confidence of the public or the Bar in the integrity of our judicial system. The public and the Bar will see Judge Brady for what she is -- the victim of a misguided and failed criminal prosecution that has left her career as a judge in ruins and of a disciplinary review that has overlooked police malfeasance, her good-faith efforts, and the human element. Carlia

Brady was a judge, but she is also a person. Whatever her human failings during the highly stressful, emotional, and fearful hours for which she is now judged, discipline is not warranted.

I therefore respectfully dissent.

In the Matter of

Carlia M. Brady,

a Judge of the Superior Court

of the State of New Jersey

JUSTICE LaVECCHIA, dissenting.

Because I am not persuaded that there is clear and convincing evidence in this record to sustain disciplinary charges and impose discipline on respondent, I respectfully dissent from the judgment of the Court.

1

**SUPREME COURT OF NEW JERSEY**
**D-10 September Term 2019**
**083462**

| | |
|---|---|
| In the Matter of | : |
| | **O R D E R** |
| Carlia M. Brady, | : |
| | **FILED** |
| A Judge of the Superior Court | : |
| | **AUG 06 2020** |
| Of the State of New Jersey | : |

*Heather J Baker*
CLERK

**Carlia M. Brady**, formerly a Judge of the Superior Court, was ordered by the Court pursuant to Rule 2:15-17(b)(2) to show cause why she should not be publicly disciplined through the imposition of an appropriate sanction that is less than removal. For the reasons set forth in the Court's opinion filed concurrently with this order, the Court concludes that there is clear and convincing evidence that respondent violated Canons of the Code of Judicial Conduct, for which she should be publicly disciplined. The Court finds that a three-month suspension is the appropriate discipline for respondent's conduct.

It is so ORDERED.

WITNESS, the Honorable Stuart Rabner, Chief Justice, at Trenton, this 6th day of August, 2020.

*Heather J Baker*

CLERK OF THE SUPREME COURT